UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                  Case No. 2:25-CR-20165

                                        HON. DAVID M. LAWSON

MATTHEW WEISS,

        Defendant.

## REPLY BRIEF ON MOTION TO SUPPRESS EVIDENCE

      The government does not defend the UMPD warrants. Instead, the government proposes a legal theory that federal agents can launder inadmissible state evidence into admissibility. When state agents illegally search computers, the government argues, they can simply tell federal agents about what was found and the federal agents can conduct a "do-over." As long as federal authorities hide the fact that evidence illegally obtained by the state is actually motivating the federal case, the government argues, federal agents can simply obtain a new warrant that makes the previously inadmissible evidence now admissible.

      This Court should firmly reject the government's "do-over" argument. The Constitution does not let the government take a mulligan. It would "reduce[] the

1

Fourth Amendment to a form of words" to allow officers to search computers illegally, contact new officers, share the illegal fruits, and then have the new officers search the seized items again to get the same fruits again. *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920) (Holmes, J.). No digital evidence would ever be off limits: The government could always just get a new warrant and search the computers again.

The government's "do-over" position rests on a jumble of arguments from different warrant exceptions that the government claims should be evaluated en masse. *See* ECF No. 32, PageID.170 n.5. But the government bears the factual burden of establishing a specific exception to the exclusionary rule—independent source, good faith, inevitable discovery, or attenuation. *See Kaupp v. Texas*, 538 U.S. 626, 633 (2003). When these exceptions are considered one by one, as the law requires, the government cannot meet its burden for any of them. Further, Mr. Weiss has standing to challenge all of the computers searched.

Finally, and in the alternative, the Court should suppress the fruits of the federal warrant outside the date window of the probable cause provided in the affidavit. The FBI crafted a warrant without a date restriction to re-find the evidence it was looking for—evidence it knew was from years before the incident that it used to get the federal warrant. This strategy should not be permitted, both because the federal warrant is defective without date restrictions and because it is

the direct fruit of the unconstitutional search.

For these reasons, the motion to suppress should be granted.

**I.       The Independent Source Exception Does Not Apply.**

The government first argues that the independent source exception applies under *Segura v. United States*, 468 U.S. 796 (1984). According to the government, *Segura* holds that the independent source exception applies as long as federal agents drafted the federal warrant without mentioning the illegal fruits they were hoping to re-find. But that is not how the independent source exception works.

The Supreme Court clarified *Segura* four years later in *Murray v. United States*, 487 U.S. 533, 542 (1988), holding the government must satisfy **_two_** requirements to establish the independent source exception. In addition to showing that the probable cause in the federal affidavit is not from the illegal state search, *Murray* requires the government to **_also_** show that the "decision to seek" the federal warrant was not "prompted" by the fruits of the illegal state search. *Id*.

The government must win on **_both_** prongs for the independent source exception to apply. As the Sixth Circuit summarized in *United States v. Williams*, 656 F. App'x 751, 753 (6th Cir. 2016):

> In order to show that the independent source doctrine applies to a warrant based on both legally and illegally obtained information, the government must make two showings by a preponderance of the evidence. *United States v. Siciliano*, 578 F.3d 61, 68 (1st Cir. 2009). First, the government must show that the initial illegal search did not prompt officers to seek a warrant for the second search. *Murray v.*

3

> *United States*, 487 U.S. 533, 542, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988); *see Jenkins,* 396 F.3d at 758. This is a fact-based inquiry that requires the district court to assess the record. . . .
>
> The government also must show that a neutral magistrate would have issued the search warrant even if she was not presented with the information obtained from the illegal search. *Jenkins*, 396 F.3d at 761. Courts make this determination by excising the illegally obtained information from the affidavit and then deciding whether the remaining legally obtained information sufficiently supports a finding of probable cause to search.

*See also Davis v. United States*, No. 21-5967, 2022 WL 14177205, at *2 (6th Cir. June 17, 2022) (Thapar, J.) ("The government must thus show that (1) no evidence obtained in the initial unlawful search 'prompted 'the subsequent lawful search and (2) the improperly obtained evidence didn't affect the magistrate's 'decision to issue the warrant.'"); *United States v. Chapman-Sexton*, 758 F. App'x 437, 440-41 (6th Cir. 2018) (trial court's failure to consider the prompting test was error).

    The separate prompting test was crucial to the outcome in *Murray* itself. When drafting the *Murray* warrant, agents carefully did not mention or include any observations from the warrantless entry. *See Murray*, 487 U.S. at 543 (describing the factual findings). The Supreme Court ruled this insufficient to establish an independent source, as there was no "explicit[] find[ing]" as to whether "the agents would have sought a warrant if they had not" conducted the previous unlawful search. *Id.* The Court therefore remanded the case back to the trial court for factual

4

findings on prompting. *See id.* at 543-44.[1]

The government's failure to recognize *Murray*'s prompting test explains why it is wrong that the proper remedy is excision. Excision is the remedy under the affect-the-decision prong of *Murray*, not the prompting prong of *Murray*. *See Williams*, 656 F. App'x at 753. If the government cannot meet its factual burden of showing absence of prompting, independent source simply does not apply. *See id. See also United States v. Siciliano*, 578 F. 3d 61, 70-71 (1st Cir. 2009).

Discovery recently provided by the government shows that it cannot meet its burden. Consider the timeline:

- 1/11/23: UMPD's illegal searches begin (ECF No. 25-1-2, PageID.124-25).

-  2/9/23: UMPD writes a memo to the FBI detailing what the illegal searches revealed. (Ex. A). FBI and UMPD hold a virtual meeting the next day. (Ex. B).

- 2/14/23: FBI SSA Sean Pruitt tells UMPD officers that he wants to "pitch" the case to federal prosecutors, and that he expects them to take the case based on the "totality" of the evidence. (Ex. B). SA Reller is assigned to brief the AUSAs. Her handwritten notes detail the fruits of the illegal searches (Ex. C).

- 2/27/23: UMPD officials meet with five FBI agents to further review the evidence in-person. (ECF No. 32, PageID.164; Ex. D).

- 2/28/23: UMPD Det. Cargill uploads evidence to the FBI's Teleporter system

---

[1] All of this is well established. *See, e.g.,* 6 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 11.4(f) (6th ed.) ( *Murray* instructs that even if the illegality unquestionably contributed not at all to the magistrate's decision to issue the warrant, the warrant is nonetheless tainted if the illegally obtained facts prompted the agents decision to seek the warrant."); *United States v. Ponzo*, 853 F.3d 558, 573 (1st Cir. 2017) ( Because this is a disjunctive test, a defendant need only win under one of the two prongs").

5

and emails SA Reller detailing the evidence, all of which is unrelated to the UM email intrusion (Ex. E). SA Reller instructs Det. Cargill that, due to an AUSA review of the state search warrants, he should delete the evidence he uploaded and "hold on sending anything obtained from the devices… until we know which federal warrants we'll be pursuing." (Ex. E).

- 3/3/23: FBI's case opening 302 indicates that it was the fruits of the illegal search that led the FBI to open the federal case. *See* Ex. F.

The picture here is clear. The illegal UMPD warrants are the linchpin to the entire federal case. Searches under those warrants revealed evidence unrelated to the small-scale University of Michigan email intrusion. That revelation led UMPD to call the FBI and drew the FBI's interest.

But the FBI had a problem: The UMPD warrants were obviously unconstitutional. In response, federal authorities obtained a federal warrant on March 27, 2023, omitting any mention that the months-long state search ever occurred at all, let alone their knowledge of what the illegal search revealed or their motivation for opening the federal case (ECF No. 32-7, PageID.209-61). What the government calls "untainted original probable cause" that "predated the UMPD device warrants" (ECF No. 32, PageID.165) was taken from a UMPD report on March 13, 2023, that the FBI requested "up to the point where we started adding information from search warrant returns." (Ex. G, Ex. H).  The FBI simply summarized some sections and copy and pasted others to create its "independent federal warrant." (PageID.162)

6

Because the illegal fruits were the federal government's guide, the federal warrant included only the specific seized devices on which state agents had previously found evidence, excluding four devices on which UMPD had found none. (Ex. I at 5). Contrary to ordinary FBI practice, federal agents drafted a warrant with no date restriction because they knew the evidence they wanted was from outside their formally-stated basis of probable cause.

In short, the entire federal case was prompted by the fruits of the illegal UMPD warrants. The federal warrant is in no way an independent source.

## II. The Good-Faith Exception Cannot Apply.

Relying on *United States v. McClain*, 444 F.3d 556 (6th Cir. 2005), the government claims that it can launder the fruits of illegal state warrants with a new federal warrant under the good-faith exception because the *federal* warrant is obtained in good faith even if the *state* warrants were not. (ECF No. 32, PageID.181-82). This argument fails by ignoring the Sixth Circuit's interpretation of *McClain* in *United States v. Tucker*, 742 F. App'x 994 (6th Cir. 2018).

*Tucker* considered the exact question before this Court: the standard when the government obtains a plainly defective warrant and then the fruits of that warrant search prompt a second warrant. *See id.* at 1002-04. The agents in *Tucker* executed a warrant that lacked probable cause (the Saxon warrant). The fruits of that search helped direct an application for a second warrant (the Penguin warrant).

In a careful opinion by Judge Boggs, *Tucker* interpreted *McClain* to mean that the fruits of the **_second_** warrant search were admissible only if **_both_** warrants independently satisfied the *Leon* good-faith test:

> [W]hen both searches are conducted pursuant to a search warrant, each warrant must be sought and executed by law enforcement in good faith as prescribed by *Leon*. For the good-faith exception to apply to the evidence seized at the Penguin residence, it must therefore be the case that: (1) the Penguin search warrant was sought and executed by law enforcement in good faith as prescribed by *Leon*, and (2) the Saxon search warrant was sought and executed by law enforcement in good faith as prescribed by *Leon*.

*Id.* at 1003. Because the first warrant failed the *Leon* test, the fruits of the second warrant were ordered suppressed without even considering whether the second warrant satisfied the good-faith exception. *See id*. at 1003-04.

*Tucker* is on all fours with this case. It stands for a common-sense point: Agents cannot just launder inadmissible evidence with a do-over. Because the UMPD warrants fail the good-faith standard, the good-faith exception cannot apply to the fruits of the federal warrant.

The government relies heavily on *United States v. Santiago*, 135 F.4th 1235 (10th Cir. 2025), which it asserts "dooms" the motion to suppress. (ECF No. 32, PageID.174). But the government misreads *Santiago*. The relevant issue in *Santiago* had not been decided below. Santiago's counsel asked the Tenth Circuit to "exercise its discretion to resolve the question" anyway, as it "present[ed] a pure question of law requiring no further factual development."

8

*See* Brief of Santiago, No. 24-6015 (10th Cir), *available at* 2024 WL 4393274, at 11. To make the issue a pure issue of law, counsel *assumed* excision was the proper remedy. *See id.* at 25-32. The Tenth Circuit then decided the "narrow" issue counsel had decided to raise. *Santiago*, 135 F.4th at 1239.

*Santiago* cannot help the government for an obvious reason: the tactical decision of a lawyer in an unrelated case to present a narrow argument to a different circuit cannot make Sixth Circuit law. The law here is provided by Judge Boggs's opinion in *Tucker*. Under *Tucker*, good-faith does not apply.[2]

---

[2] The government proposes that, even if the *Leon* test cannot be met, there is an additional good-faith limit to suppression under the cost/benefit culpability standards adopted in *Herring v. United States,* 555 U.S. 135 (2009), later repeated in *Davis v. United States*, 564 U.S. 229 (2011), by which "[s]uppression is only called for when the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights," (PageID.180). That is false. *United States v. Lazar*, 604 F. 3d 230 (6th Cir. 2010), establishes that nothing in *Herring* altered or expanded the standard under the good faith exception for warrant defects, *see id.* at 237-38, which must be based on the "four corners" of the warrant and affidavit. *United States v. Laughton*, 409 F.3d 744, 751 (6th Cir. 2005).
   Further, additional culpability beyond *Leon* surely exists here. The federal government's scheme to obtain a new warrant was an intentional effort to launder inadmissible fruits of state warrants into something the federal government could argue was admissible, all while concealing the fruits of the state warrants from the federal magistrate judge. This contrivance exhibited reckless if not deliberate disregard for Mr. Weiss's Fourth Amendment rights.
   Moreover, suppression in this case is needed to deter violations of Fourth Amendment rights. *See Davis*, 564 U.S. at 236-37. Approving the government's do-over strategy would encourage officers nationwide to conduct illegal computer searches and simply pass on the fruits to other agents for a do-over warrant. The need to protect privacy in computers, as *Riley v. California*, 573 U.S. 373, 401 (2014) requires, easily justifies suppression.

9

### III. The Attenuation Exception Does Not Apply.

The government also suggests that the attenuation exception applies. Attenuation is "something akin to proximate cause: whether the causal link has become so attenuated as to dissipate the taint." *United States v. Cooper*, 24 F.4th 1086, 1092 (6th Cir. 2022).

This is not an attenuation case for a simple reason: The evidence here was actually discovered by the UMPD during its illegal forensic searches. When the FBI executed its warrant, it took the actual fruits of the illegal state warrants—the state's digital images from its illegal warrant execution—and used them as the starting point for the federal search. *See* Ex. J; Ex. K.

Further, there is no attenuation if one takes the correct question to be the connection between the unlawful state warrant search and the federal warrant do-over. As noted earlier, the illegal search prompted the state to contact the FBI. The FBI opened its case because of the illegally-obtained fruits. *See supra* Ex. A-F. The illegal evidence transformed a local hacking case into something the FBI was eager to prosecute. *See id.*

### IV. The Inevitable Discovery Exception Does Not Apply.

The inevitable discovery exception also fails. This exception requires the government to prove through "historical facts . . . an independent, untainted investigation that inevitably would have uncovered the same evidence or other

compelling facts establishing that the disputed evidence inevitably would have been discovered." *United States v. Lazar*, 604 F.3d 230, 240 (6th Cir. 2010).

The government's burden cannot be met. As explained above, the entire federal case rests on the fruits of the illegal UMPD searches. Without them, UMPD would never have contacted the FBI in the first place. The FBI, if contacted, would not have been interested in a small local case. The illegal fruits triggered the FBI's entire case, directing the FBI to know which computers to search, (Ex. I at 5), and ensuring no date restrictions were used in the federal warrant so the FBI could get the years-old evidence that was the true-but-concealed target of the FBI search.

### V. Mr. Weiss Has Standing to Challenge the Search of His Workplace Computers.

The government argues that Mr. Weiss lacks standing to challenge the search of his workplace computers. That is wrong. Mr. Weiss's standing is established by *Mancusi v. DeForte*, 392 U.S. 364 (1968).

In *DeForte*, state officials searched a union office consisting of "one large room, which [the defendant DeForte] shared with several other union officials," seizing union records there. *Id*. at 368. The Supreme Court held that DeForte had standing to challenge the search of the office he shared with other officials. *Id*. at 369. "[O]ne has standing to object to a search of his office," the Court noted, and that was true even though "DeForte shared an office with other union officers." *Id*.

11

Because "DeForte still could reasonably have expected that only those [who used the office] and their personal or business guests would enter the office," that "expectation was inevitably defeated" by the entrance of law enforcement. *Id*.

That is equally so here. The workplace computers are no different from the union records seized from DeForte's office. As *DeForte* emphasized, the fact that an employee lacks property rights in the evidence sought is irrelevant. *See id.* at 367-68. DeForte did not own the union records in his shared office, but the Supreme Court ruled that he had standing to challenge the office search and the seizure of the records. *See id*. at 368-69. The fact that Mr. Weiss did not own the UM computers he used is similarly irrelevant. *DeForte* alone establishes standing.

The government argues that the special government workplace standards should apply from the plurality opinion in *O'Connor v. Ortega*, 480 U.S. 709 (1987). That is incorrect. The *Ortega* plurality standard applies only to searches directed by "public employers [who] are not enforcers of the criminal law[.]" *Id*. at 724 (plurality opinion). "The rationale for the lesser burden *O'Connor* places on public employers is not applicable for federal agents engaged in a criminal investigation." *United States v. Taketa*, 923 F.2d 665, 675 (9th Cir. 1991).

None of the computers were searched prior to UMPD's search. Both the FBI and the UMPD searched the computers purely in a law enforcement capacity. From the beginning, the investigation of Mr. Weiss was a criminal investigation

12

using traditional law enforcement tools such as search warrants and *Miranda* warnings. *See* Ex. L. Because this was a law enforcement search, not an employer search, *Ortega*'s framework does not apply. *See Taketa,* 923 F.2d at 675; *United States v. Johnson*, 871 F.Supp.2d 539, 542-43 (W.D. La. 2012).

Even if the *Ortega* plurality standard were to apply, the "operational realities" of Mr. Weiss's workplace make his expectation of privacy in the computers reasonable. *Ortega*, 480 U.S. at 717-19. Mr. Weiss's affidavit explains that he was assigned a private, locked office and exclusive use of a desktop computer, work cell phone, and iPad, all of which were password-protected using credentials known only to him and configured to lock automatically. He was permitted to use the devices for personal purposes, regularly did so, and was allowed to customize and manage their contents without employer oversight. There were no banner warnings prohibiting personal use, shared spaces were accessible only to a small group of team members, and there was no evidence of routine searches or any monitoring of device content. (Ex. M).

These facts establish the "operational realities" of privacy in the workplace computers. *See James v. Hampton*, 592 F. App'x 449, 356 (6th Cir. 2015) (employee's use of locks, and absence of routine searches by others, establish privacy under the *Ortega* plurality); *Leventhal v. Knapek*, 266 F.3d 64, 73–74 (2d Cir. 2001) (absence of "general practice of routinely conducting searches of office

computers" or notice of "no expectation of privacy" established privacy under *Ortega*); *United States v. Wilson*, 984 F. Supp.2d 676, 684-85 (E.D.Ky. 2014).

The government argues that UM policies eliminated Weiss's expectation of privacy under the *Ortega* plurality standard. This, too, is wrong. UM's policy on computer monitoring is highly protective of employee privacy. It begins:

> The University of Michigan respects the privacy of its employees and seeks to foster a climate free from arbitrary or capricious monitoring of employees and the records they create, use, or control.

*Standard Practice Guide, Privacy and the Need to Monitor and Access Records*, (Ex. N).³ The policy expressly acknowledges that employees will "use University resources . . . to conduct personal matters at their work sites[.]" *Id*. Consistent with UM's privacy commitment, UM policy generally prohibits monitoring. The policy states that "neither the University nor any employee acting on behalf of the University will access records or monitor . . . University computers, networks, offices, and telephones[.]" *Id*. The policy then offers a narrow exception, allowing the accessing of "personal records" **_only_** "[w]hen there is reasonable cause to believe that the employee has engaged in misconduct and may have used University resources improperly." *Id*.

This exception cannot relinquish privacy under either caselaw or common sense. The exception simply alerts employees to the Fourth Amendment standard

---

³ Available at https://spg.umich.edu/policy/601.11.

that already exists. Between *Ortega*'s plurality opinion and Justice Scalia's concurrence, *Ortega* establishes a Fourth Amendment rule that public employers can conduct work-related searches "when there are reasonable grounds for suspecting that the search will turn up evidence that the employee is guilty of work-related misconduct[.]" *Ortega*, 480 U.S. at 726 (plurality). *See also id.* at 732 (Scalia, J., concurring) (allowing searches "to investigate violations of workplace rules"). Merely informing employees of the contours of their constitutional rights—as the UM policy does—cannot eliminate those rights.

The UM policy is functionally identical to the university policy held to establish a reasonable expectation of privacy in *United States v. Heckenkamp*, 482 F.3d 1142 (9th Cir. 2007). *Heckenkamp* considered the University of Wisconsin's computer policy, which stated:

> In general, all computer and electronic files should be free from access by any but the authorized users of those files. Exceptions to this basic principle shall be kept to a minimum and made only where essential to... protect the integrity of the University and the rights and property of the state.

*Id*. at 1147. According to the Ninth Circuit, the fact that the policy established "limited instances in which university administrators may access his computer in order to protect the university's systems" did not eliminate Heckekcamp's Fourth Amendment rights. *See id.*

*Leventhal v. Knapek*, 266 F.3d 64 (2d Cir. 2001) (Sotomayor, J.), is also on

15

point. In *Knapek*, a government employee was held to have Fourth Amendment rights in his workplace computer even though "technical support staff had access to all computers," would occasionally access them for maintenance or to reprogram them, and searched them when they suspected workplace misconduct. *Id*. at 74-76. According to then-Judge Sotomayor:

> This type of infrequent and selective search for maintenance purposes or to retrieve a needed document, justified by reference to the "special needs" of employers to pursue legitimate work-related objectives, does not destroy any underlying expectation of privacy that an employee could otherwise possess in the contents of an office computer.

*Id*. at 74. Under *Ortega*, *Heckenkamp*, and *Knapek*, Mr. Weiss has standing in all of his workplace computers.

The government argues that Mr. Weiss lost his Fourth Amendment rights in the workplace computers when they were seized. This argument confuses searches and seizures, which are very different concepts. *See Soldal v. Cook County*, 506 U.S. 56, 63 (1992). The seizure of a computer does not allow a search of it because seizing a device does not eliminate a reasonable expectation of privacy in its contents. *See Riley v. California*, 573 U.S. 373, 401 (2014).

Although the Court need not reach the issue, suppression of the evidence is justified for the workplace computers even if the Court holds that Mr. Weiss lacks standing in the workplace computers. A defendant has standing to challenge fruits of searches of property in which they lack standing if they result from illegal

16

searches in places where he has standing. *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (where seizure of evidence from one defendant led to evidence from a second defendant, the first defendant has standing to suppress fruits of the search of the second); *United States v. Gordon*, 346 F.Supp.3d 999, 1005-06 (E.D.Mich. 2018) (Berg, J.) ("A defendant does not only have standing . . . in relation to her own property, but also in relation to property or information from third parties that was obtained as a result of illegality by police."). In this case, the searches of the workplace computers by federal officials were fruits of the unlawful state searches of Mr. Weiss's personal computers. Because Mr. Weiss has standing to challenge the unlawful state searches of his personal computers, the workplace computers are also subject to suppression even if Mr. Weiss lacks independent standing in the workplace computers.

### VI. The Fruits of the Federal Warrant Outside the Time Period of Probable Cause Should Be Independently Suppressed.

Finally, even if the Court rejects the above arguments, the fruits of the federal warrants found outside the proper time window of its formally-stated basis for probable cause must be suppressed. Federal authorities knew that the evidence they needed was from the months and years before their narrow window of probable cause. To make sure they would find that evidence, the FBI needed to (and did) obtain a warrant with no date restrictions that could allow them to "find" the evidence from years before.  The absence of date restrictions was central to the

federal warrant strategy: It was the key to making sure the FBI would find the evidence that was actually motivating the federal investigation—and that was concealed from Magistrate Judge Patti when he reviewed the warrant application.

The date range of the events that formed the formal basis for probable cause was highly specific and narrow. It was based entirely on events in late December 2022. As the affidavit explains, the federal warrant's stated basis for probable cause was password resets on the UM network that occurred "between December 21 and 23, 2022." (ECF No. 32-7, PageID.216). According to the affidavit, the security vulnerability that allowed the password resets was fixed on the night of December 23, 2022. (ECF No. 32-7, PageID.225). Some related activity was observed on December 25, 2022. (ECF No. 32-7, PageID.225). All of these events are precisely time-stamped in the affidavit.

Crucially, the affidavit contains ***absolutely no reason*** to think that any criminal activity occurred ***before*** December 21, 2022, or that any evidence relating to the crime would predate that time, let alone extend back years. Nothing about the nature of password resets suggests evidence before those dates. No logs of past activity were discussed.

Under ordinary circumstances, a federal investigation into computer hacking would seek a date-restricted warrant for hacking evidence during and around those dates. Sixth Circuit law makes clear that "failure to limit broad descriptive terms

18

by relevant dates, when such dates are available to the police, will render a warrant overbroad." *United States v. Lazar*, 604 F.3d 230, 238 (6th Cir. 2010) (quoting *United States v. Ford,* 184 F.3d 566, 576 (6th Cir. 1999)). Failure to include dates, where available, justifies suppression of records from earlier time periods. *See Ford*, 184 F.3d at 576-78; *United States v. Abboud*, 438 F.3d 554, 576 (6th Cir. 2006). And the dates were obviously available here, as the earliest date of relevant conduct was December 21, 2022. *See generally United States v. Demasi*, 715 F.Supp.3d 1009, 1017 (E.D. Mich. 2024).

Digital warrants in other cases obtained by the Assistant U.S. Attorney in this case all include date limits.[4] The decision to not include date restrictions in this warrant application was presumably intentional. It was the key to ensuring that most of the evidence the agents knew about in this case would be "discovered."

The failure to include date restrictions in the federal warrant justifies suppression. Under *Ford*, *Lazar*, *Abboud*, and *Demasi*, the absence of date restrictions renders the federal warrant overbroad and requires suppression of evidence from before the dates of the password resets on December 21, 2022. As part of its strategy, the federal government sought a warrant based on a narrow date range of events. In the event this Court permits the government to make

---

[4] *United States v. Stetkiw*, No. 2:18-cr-20579 (October 25, 2017); *United States v. Howard*, No. 2:23-mc-50751 (July 13, 2023); *Domain mandarincc.ru*, No. 2:19-mc-51360 (June 1, 2023).

previously inadmissible evidence admissible in this way, it should at the very least hold the government to its choice by suppressing evidence outside of the affidavit's date window.

Respectfully submitted,

| | |
|---|---|
| /s/ David Benowitz | /s/ James Gerometta |
| David Benowitz | James R. Gerometta |
| Paulette Pagan | Law Office of James Gerometta |
| Price Benowitz LLP | 27 E. Flint Street |
| 409 7th Street, NW | Suite 2 |
| Suite 300 | Lake Orion, MI 48362 |
| (202) 271-5249 | (313) 530-9505 |
| David@PriceBenowitz.com | James@Geromettalaw.com |
| Paulette@PriceBenowitz.com | |

*Counsel for Matthew Weiss*

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of February 2026, I electronically filed the foregoing Motion with the Clerk of the Court using the ECF system which will send notification of such filing to the following: Timothy Wyse at the United States Attorney's Office.

/s/ David Benowitz
David Benowitz

*Counsel for Matthew Weiss*

20