UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

|  |  |
|---|---|
| Plaintiff, | Case Number 25-20165 |
| v. | Honorable David M. Lawson |

MATTHEW WEISS,

Defendant.

_____/

## OPINION AND ORDER GRANTING MOTION TO SUPPRESS EVIDENCE SEIZED FROM ELECTRONIC DEVICES AND DENYING MOTION TO SUPPRESS EVIDENCE SEIZED FROM iCLOUD ACCOUNT

A federal grand jury charged defendant Matthew Weiss with unauthorized computer access and aggravated identity theft stemming from allegations that he hacked into the internet accounts of student athletes at the University of Michigan, where he coached football, and elsewhere, downloading personal identifying information and photographs. Much of the evidence against him was obtained through searches of electronic devices under the authority of search warrants issued by state and federal magistrates. Weiss has filed two motions to suppress the fruits of those searches, contending that the state search warrants were overbroad and violated the particularity requirement of the Fourth Amendment. The search warrants issued by the state magistrate are difficult to defend, as the government appears to acknowledge, but the information is admissible, the government argues, because later-issued federal search warrants for most of the same electronic devices cured the constitutional defects in the state warrants. The government offers other reasons not to apply the exclusionary rule to the fruits of the device searches. None of those arguments is persuasive, and the materials obtained from certain computers, tablets, and smart phones, identified below, will not be allowed into evidence. Weiss also moves to suppress evidence obtained from a warranted search of an iCloud account, but the evidence obtained from

that source passes constitutional muster.  The defendant's motion to suppress the evidence from the search of the devices will be granted and his motion to suppress the information obtained from the iCloud account will be denied.

## I.

## A.

The Fourth Amendment requires that search warrants must particularly describe the place to be searched and the items to be seized, and that the judicial officer who issues such a warrant must have probable cause to do so within the context of the investigation.  *United States v. Greene*, 250 F.3d 471, 476-77 (6th Cir. 2001).  This general rule frames the following discussion of the investigators' conduct in this case.

According to the affidavits presented in support of the search warrant requests to a state magistrate, on December 21, 2022, a user contacted the University of Michigan Information Technology Services department (UMITS), complaining that someone other than herself had reset her password.  Search Warrant Application, ECF No. 32-4, PageID.194.  UMITS traced the password-reset incident to an internet protocol (IP) address linked to two University of Michigan Athletic Department computers that were used to access 46 alumni accounts between December 21 and 23, 2022.  *Ibid.*  The two computers were located in Schembechler Hall, an athletic department training facility — one in the quarterbacks' meeting room and one in defendant Weiss's personal office.  *Ibid.*  A third computer in the tight end meeting room also was identified as a source of unauthorized account access.  *Id.* at PageID.195.

University investigators found that a hacker had exploited a flaw in its account-recovery system to redirect password-reset codes to the hacker's own phone instead of the actual account holder's phone.  *Ibid.*  The redirected authorization codes were sent either to a phone number

associated with defendant Weiss or one of two Voice Over Internet Protocol (VOIP) phone numbers. *Ibid.* Security footage showed that Weiss was in his office when at least three unauthorized access attempts linked to his office computer occurred. *Ibid.* A UMITS investigator determined that data from alleged victims' accounts was transferred from Weiss's office computer and the quarterback room computer into one or more external storage devices. *Ibid.*

Based on these facts, Detective John Buehler of the University of Michigan police department (UMPD) applied for warrants on January 10, 2023 to seize three computers at Schembechler Hall and 14 electronic devices (cell phones, tablets, storage devices, etc.) at Weiss's house. Police executed the search warrants the next day, obtaining multiple cell phones, personal computers, external storage devices, and related materials. *See* Warrant Returns and Tabulations, ECF No. 32-5, PageID.203; ECF No. 32-6, PageID.208. A copy of the search warrant, supporting affidavit, and tabulation was served on a person at both premises (although the person served at Schembechler Hall was identified merely as "scene"). *Ibid.* Three desktop computers that UMPD would eventually examine — Weiss's office computer and one each in the quarterbacks' and tight ends' rooms — were not seized under the warrant because the athletic department already had provided them voluntarily to UMPD on January 6, 2023, since they belonged to the University. ECF No. 32-7, PageID.225-26.

Buehler applied for two more search warrants on January 11, 2023, averring in his affidavit that there was "probable cause that evidence associated to [sic] the unauthorized access could be found on computers, security logs, cellphones, tablets and other electronic storage devices that can be used to store data." ECF No. 32-3, PageID.190; ECF No. 32-4, PageID.195. However, Buehler's application included more than a request to search for evidence of unauthorized access. Instead, he sought "a full forensics examination" of the three desktop computers "to include

photographs, videos, recordings, text messages, emails, social media applications, files and metadata, directories, deleted files, maps and geographical locations." ECF No. 32-4, PageID.194. Using the same allegations, Buehler applied for another search warrant for a "full forensic examination" of 14 electronic devices (cell phones, tablets, storage devices, etc.) taken from Weiss's house and office. Search Warrant Application, ECF No. 32-3, PageID.188-190.

Responding to those requests, the state court magistrate issued two warrants on January 11, 2023, one to search the University computers and another to search the electronic devices seized from Weiss's personal residence and office. The authorization to search the computers at Schembechler Hall read as follows:

> A full computer forensics examination of the above listed devices to include photographs, videos, recordings, text messages, emails, social media applications, files and file metadata, directories, deleted files, maps and or geographical locations.

ECF No. 32-4, PageID.196. The authorization to search the devices seized from Weiss's house and office stated:

> A full computer forensics examination of the above listed devices to include photographs, videos, recordings, text messages, emails, social media applications, files and file metadata, directories, deleted files, maps and or geographical locations. Use of any software to bypass encryption and/or passcodes.

ECF No. 32-3, PageID.191.

On January 20, 2023, UMPD obtained another search warrant, this time directed to Apple, Inc. The search warrant sought various data associated with defendant Weiss's Apple account, including "[a]ll iCloud data associated with any backups of iPhones associated with this account" and "all files, including photographs and videos, stored in iCloud or other server or Apple facilitated format," but the magistrate expressly limited the search to "records, data, or information . . . between the dates of 08-29-2022 through 01-05-2023 for evidence of the crime of Unlawful Access to a Computer." ECF No. 32-9, PageID.270. Apple produced data in response

- 4 -

to the warrant on February 3, 2023.  ECF No. 44-2, PageID.384.  Its response warned that "certain files within the iCloud backup data may contain aggregated data where Apple was unable to apply a date filter."  *Id.* at PageID.385.  Apple ultimately returned some data that covered a timeframe beyond the warrant's specified time limit, including photographs last modified in 2020.  *See* ECF No. 54-1.  Detective James Cargill of UMPD stated in an email in 2025 that he reviewed and "tagged" 14 of the files returned from Apple, although it is unclear if any of the files were outside of the search warrant's temporal scope.  ECF No. 54-2, PageID.547.  Other than that, there is no evidence that anyone at UMPD reviewed the contents of Apple's data production before it ultimately was turned over to the FBI.

The UMPD eventually contacted the FBI about the investigation on February 9, 2023. UMPD Detective Ryan Cavanaugh sent a memorandum to FBI Supervisory Senior Resident Agent Pat Geahan on that date describing what the UMPD had found thus far in its forensic searches of the devices:

> First batch of search warrants for Weiss's office at Schembechler Hall and his residence. Multiple computers, external hard drives, and cell phones were confiscated. One external hard drive was found in his top, dresser drawer and that one is password protected.
>
> During forensic examination of the desktop computer in Weiss's office and the QB Meeting Room PC, a spreadsheet containing all of the UofM victims was located. The spreadsheet contained detailed personal information along comments [sic] of what was found in their (victims) accounts.
>
> A separate spreadsheet was then located. This spreadsheet, created by Weiss, contained information of over 30 different universities, male and female student [sic]. Some of the information in the spreadsheets include name, address, DOB, SSN, screen names, and notes, similar to the UofM victim spreadsheet.
>
> Det. Cargill found a large amount of thumbcache photos, containing pictures of victims and or [sic] personally identifiable information. These pictures are from UofM victims as well as victims from numerous other schools.

ECF No. 58-1.

Representatives of the UMPD and the FBI scheduled a Microsoft Teams meeting for February 10, 2023, titled "Weiss Meeting."  ECF No. 49-3, PageID.504.  The documents in the record do not state whether this meeting took place, although there is no basis to believe it did not. In a follow-up email dated February 14, 2023, after the meeting presumably occurred, FBI agent Sean Pruitt wrote to the meeting attendees, "We are going to pitch this as a cyber case to the United States Attorney's Office on Thursday.  I believe they will take it based on the totality of the circumstances.  If they do, we will open the FBI case and I will have our cyber Special Agent reach out to y'all directly."  *Ibid.*

A few pages of handwritten notes dated February 17, 2023, apparently written by FBI Special Agent Kelly Reller, detail additional information about the UMPD's review of the devices and the status of the investigation.  ECF No. 58-3.  The notes suggest that the UMPD had reviewed data from multiple devices at that point, including an external storage drive.  *Id.* at PageID.588 ("Got into drive he was downloading pics to[.]").  They also observe that the UMPD had discovered "nude photos" and social security numbers associated with certain victims.  *Id.* at PageID.587.

The UMPD and the FBI met on February 27, 2023, apparently in person.  ECF No. 49-5, PageID.507; ECF No. 32, PageID.164.  The next day, the UMPD forensic analyst Tom Cargill sent Special Agent Reller a list of identified or probable victims based on his review of the devices thus far.  ECF No. 58-4.  He uploaded a batch of documents through Teleporter, a file-transfer system maintained by the FBI.  *Ibid.*  Special Agent Reller asked the UMPD to remove the spreadsheets from teleporter while federal prosecutors determined which search warrants to pursue.

> Hi Tom – Thanks for the update.  I took a look at Teleporter and can see your uploads.  I just touched base with John and our AUSAs regarding warrant

returns/contents.  The AUSAs will first need to take a look at the search warrants. So let's hold on sending anything obtained from the devices (including spreadsheets) and any returns until we know which federal warrants we'll be pursuing.  Erring on the side of caution, we can remove the spreadsheets from Teleporter to avoid opening anything that we may need to first pursue with a federal warrant.

*Id.* at PageID.591.

On March 3, 2023, SA Reller requested approval to open a full investigation.  ECF No. 58-5.  In her request, she discussed the evidence that the UMPD had uncovered in the device searches:

UMPD obtained search warrants for Weiss' residence and his Schembechler Hall office.  UMPD confiscated multiple computers, external hard drives, and cell phones.  While examining Weiss' computer, investigators located a spreadsheet of UM victims with detailed personal information found in their email accounts.  Another spreadsheet was located, containing information about victims from more than 30 universities.  This spreadsheet contained similar types of personal information found in the UM spreadsheet, including names, addresses, dates of birth, social security numbers, screen names, and notes.

A large amount of thumbcache photos were also discovered by UMPD.  The photos were of UM students and students at other universities, in addition to personally identifiable information.  Though some male students were included among the UM victims and those from other universities, the majority of victims appeared to be female former student athletes.  Weiss has since been fired by UM.

*Id.* at PageID.598.  The government states that its investigation was opened on the same day.  ECF No. 32, PageID.164.

On March 27, 2023, the FBI sought and obtained a search warrant from a federal magistrate judge permitting forensic searches of most of the devices acquired by the UMPD, along with portions of the iCloud data provided by Apple.  ECF No. 32-7.  The facts offered in support of probable cause in the federal application are similar to those offered in support of the UMPD's search warrant applications, in that they focus on the alleged unauthorized login attempts that occurred in December 2022.   ECF No. 32-7, PageID.216-230.  As the government repeatedly observes its briefing, the search warrant application did not discuss any of the evidence that the UMPD had found in its forensic searches.  The search warrant authorized a search of most of the

devices seized and searched by the UMPD, along with the iCloud data, for evidence of "computer fraud and abuse" in violation of 18 U.S.C. § 1030.   ECF No. 32-7, PageID.253-61.

The government has provided a table listing the devices that the UMPD seized, how the UMPD obtained them, and whether they were subject to search under the FBI's federal warrant. The table is reproduced below:

| Device | Original Location | Means UMPD Gained Posession | Owner | Subject of FBI Warrant |
|---|---|---|---|---|
| HP ProDesk 600  (2UA4371F39) | Weiss's Office | Turned over to UMPD by UM ITS | UM | Yes |
| HP ProDesk 600 (2UA4431ZFS) | QB Meeting Room | Turned over to UMPD by UM ITS | UM | Yes |
| HP ProDesk 600 (2UA4511VP2) | TE Meeting Room | Turned over to UMPD by UM ITS | UM | No |
| Motorola cell phone | Weiss's Office | UMPD Warrant #1 | Weiss | Yes |
| Apple iPad | Weiss's Office | UMPD Warrant #1 | UM | Yes |
| Seagate external drive | Weiss's Office | UMPD Warrant #1 | Weiss | Yes |
| Western Digital external drive | Weiss's Office | UMPD Warrant #1 | Weiss | Yes |
| Apple iPhone | Weiss's Office | UMPD Warrant #1 | UM | Yes |
| Apple iPhone Max | Weiss's Office | UMPD Warrant #1 | Weiss | Yes |
| MacBook Pro | Weiss's Home | UMPD Warrant #6 | Weiss | Yes |
| SanDisk Cruzer 4GB USB drive | Weiss's Home | UMPD Warrant #6 | Weiss | Yes |
| USB Drive, blue cover | Weiss's Home | UMPD Warrant #6 | Weiss | Yes |
| 8 GB SanDisk SD card (DSLR camera) | Weiss's Home | UMPD Warrant #6 | Weiss | Yes |
| 16GB Sony SD card (video camera) | Weiss's Home | UMPD Warrant #6 | Weiss | Yes |
| Toshiba external hard drive | Weiss's Home | UMPD Warrant #6 | Weiss | Yes |
| Apple MacBook (Grey) | Weiss's Home | UMPD Warrant #6 | Weiss | No |
| Apple iPhone (Rose Gold) | Weiss's Home | UMPD Warrant #6 | Weiss | No |

ECF No. 32-2, PageID.187.

B.

The grand jury returned an indictment in this case in March 2025, alleging several counts of unauthorized computer access in violation of 18 U.S.C. § 1030 and aggravated identity theft in violation of 18 U.S.C. § 1028A.  The defendant filed a motion to suppress the fruits of the warrants to search the digital devices.  Weiss argues that the search warrants obtained by the UMPD lack the particularity that the Fourth Amendment requires and are, in effect, prohibited general warrants.  Although he does not level the same criticism at the search warrant that the government obtained later, he says that the federal warrant does not "cure" the deficiencies in the state search

warrants because the FBI's decision to seek a federal warrant was "prompted" by the fruits of the illegal state warrants.

Weiss also moves to suppress the evidence obtained from his iCloud account that Apple produced to the government beyond the date range provided in the warrant. He says that the government has reviewed data produced by Apple beyond this timeframe, including photographs last modified in 2020. He contends that, by reviewing those items, the government has "flagrantly disregard[ed] the limitations of the warrant," thereby converting an otherwise valid warrant into an invalid general warrant.

## II.

The government first questions Weiss's "standing" to challenge the search of his digital devices, especially those that belonged to the University. Characterizing this question as one of "standing" miscasts the issue. The Supreme Court rejected the concept of "standing" for Fourth Amendment violations in *Rakas v. Illinois*, 439 U.S. 128, 139-40 (1978), *abrogated in part by Minnesota v. Carter*, 525 U.S. 83 (1998). It is commonly acknowledged that "in determining whether a defendant is able to show the violation of his . . . Fourth Amendment rights, the 'definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.'" *Carter*, 525 U.S. at 88 (quoting *Rakas*, 439 U.S. at 140). More than twenty-five years ago, the Sixth Circuit itself recognized that "the concept of 'standing' has not had a place in Fourth Amendment jurisprudence for more than a decade" and that "the matter of standing in the context of searches and seizures actually involve[s] substantive Fourth Amendment law [in which] . . . a defendant [must] prove a legitimate expectation of privacy as a prerequisite to challenging assertedly unlawful police conduct." *United States v. Smith*, 263 F.3d 571, 581-82 (6th Cir. 2001) (quoting *United States v. Sanchez*, 943 F.2d 110, 113 n.1 (5th

Cir. 1991)).  The Supreme Court has observed that the term "standing" can be a "a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search[.]"  *Byrd v. United States*, 584 U.S. 395, 410 (2018).  But it has warned that "it should not be confused with Article III standing, which is jurisdictional and must be assessed before reaching the merits."  *Id.* at 410-11.

The government asserts that Weiss has no legitimate expectation of privacy in five of the devices (the three computers from Schembechler Hall, an iPad, and an iPhone) because, as indicated in the table above, they are owned by the University of Michigan.  To establish a reasonable expectation of privacy, the defendant must show "(1) that he had a subjective expectation of privacy, and (2) that his expectation was objectively reasonable."  *United States v. Washington*, 573 F.3d 279, 282 (6th Cir. 2009) (citing *United States v. Pollard*, 215 F.3d 643, 647 (6th Cir. 2000)).  An expectation of privacy is objectively reasonable when it is one that "society is prepared to recognize as legitimate."  *Id.* at 283 (quoting *Pollard*, 215 F.3d at 647).  Factors relevant to whether a defendant's expectation of privacy is objectively reasonable include "his proprietary or possessory interest in the place to be searched," "whether he had the right to exclude others from the place in question," and "whether he had taken normal precautions to maintain his privacy."  *United States v. Trice*, 966 F.3d 506, 513 (6th Cir. 2020) (cleaned up).  The defendant has the "burden of establishing his standing to assert a Fourth Amendment violation."  *United States v. Jenkins*, 743 F. App'x 636, 648 (6th Cir. 2018) (quoting *Smith*, 263 F.3d at 582).

In *O'Connor v. Ortega*, 480 U.S. 709 (1987), a four-justice plurality of the Supreme Court held that public employees may have reduced expectations of privacy in their workplaces, at least when the search is conducted by their employer.  "Individuals do not lose Fourth Amendment rights merely because they work for the government instead of a private employer," the plurality

reasoned, but "[t]he operational realities of the workplace . . . may make some employees' expectations of privacy unreasonable when an intrusion is by a supervisor rather than a law enforcement official." *Id.* at 717. Therefore, "[p]ublic employees' expectations of privacy in their offices, desks, and file cabinets, like similar expectations of employees in the private sector, may be reduced by virtue of actual office practices and procedures, or by legitimate regulation." *Ibid*. And, in some cases, "some government offices may be so open to fellow employees or the public that no expectation of privacy is reasonable." *Id.* at 718. Nonetheless, the Court held that Dr. Ortega, the subject of the challenged search, had a reasonable expectation of privacy in the papers and records in his desk and office file cabinets, where he did not share that space with other employees, he occupied the office for 17 years, he kept private records and other personal items in that space that were unrelated to his work at the hospital where his office was located, and there were no rules or regulations discouraging employees from keeping such items in their offices. *Id.* at 718-19.

The *O'Connor* plurality pointed out that the absence of an employer's policy restricting the storage of personal items "does not create an expectation of privacy where it would not otherwise exist." *Id.* at 719. An employee's expectation of privacy may be reduced by an employer's "practices and procedures." *Id.* at 717. Seizing on these points, the Sixth Circuit has "relied on *O'Connor* for the proposition that government employees' expectation of privacy in the workplace can be reduced through regulations or prior notice to employees that their workspaces were subject to search." *James v. Hampton*, 592 F. App'x 449, 455 (6th Cir. 2015) (citations omitted).

The parties debate the impact of the University of Michigan's IT policies on Weiss's expectation of privacy.  One such policy, titled "Privacy and the Need to Monitor and Access Records," states:

> The University of Michigan respects the privacy of its employees and seeks to foster a climate free from arbitrary or capricious monitoring of employees and the *records* they create, use, or control.
>
> Nonetheless, the University must, at times, access *records* or monitor *record systems* that are under the control of its employees. Furthermore, because the University permits some latitude for employees to use University resources to conduct University business off-campus and to conduct personal matters at their work sites, *work-related records* and employees' *personal records* may be located in the same place.

University of Michigan, Standard Practice Guide 601.11: Privacy and the Need to Monitor and Access Records, § I, ECF No. 49-15.  The italicized words and phrases in the above paragraphs are defined terms with definitions provided elsewhere in the policy.  A "record" includes "any document, file, computer program, database, image, recording, or other means of expressing fixed information that is created, received, used, or maintained within the scope of University business or employment at the University or that resides on University-controlled premises or property." *Id.* § VI.A.  A "record system" includes any device where "records" are stored or disseminated, such as University-owned computers or networks.  *Id.* § VI.B.  A "personal record" is a "record that is created, received, used, or maintained by an employee for a purpose not related in any way to his or her work for the University." *Id.* § VI.F.  The policy narrowly circumscribes the situations when the University may review "personal records":

> The University and its employees will not access or monitor the content of *personal records* . . . or monitor the *personal records* . . . [or] content of *record systems*, except under the following circumstances:
>
> (a) When an employee who controls *faculty-owned scholarly* or *personal records* (e.g. password, assigned office holder, etc.) is unavailable or unwilling to give consent to access and when it is necessary for the University to determine

whether there are *business records* contained therein, the University will access such *records* only to the extent necessary; or

(b) When there is reasonable cause to believe that the employee has engaged in misconduct and may have used University resources improperly.

*Id.* § III.A.b(3).

Another policy, titled "Responsible Use of Information Resources," requires users to comply with state and federal laws and University of Michigan policies, refrain from attempts to circumvent security measures, respect the privacy of other users, and "[n]ot falsely assume another person's or entity's identity or role through deception without proper authorization." University of Michigan, Standard Practice Guide 601.07: Responsible Use of Information Resources, ECF No. 32-8, PageID.263. The government contends that Weiss was notified of this policy every time he logged into one of the University-owned desktop computers, ECF No. 32, PageID.167, although Weiss disputes this, *see* Weiss Dec, ¶12, ECF No. 49-14, PageID.519.

The government reasonably contends that these policies undermine any reasonable expectation of privacy that Weiss might have had in the computer files. It points to *O'Connor*'s statement that certain public employees' expectations of privacy "may be reduced by virtue of actual office practices and procedures . . . ." 480 U.S. at 717. But the Supreme Court has recognized that employee expectations may differ for searches conducted by their employer and those conducted by law enforcement. In *Mancusi v. DeForte*, 392 U.S. 364 (1968), for instance, the Court held that a union employee could challenge the search of his office by police, even though he shared the office with other coworkers and did not personally own the records that were searched. 392 U.S. at 368-70. The *O'Connor* plurality cited *Mancusi* when observing that "[t]he operational realities of the workplace . . . may make *some* employees' expectations of privacy unreasonable *when an intrusion is by a supervisor rather than a law enforcement official*." *O'Connor*, 480 U.S. at 717 (second emphasis added).

- 13 -

It is true that the University's published policies notify employees that their devices may be searched when there is reason to believe that an employee engaged in misconduct or misused the computer system, Standard Practice Guide 601.11, § III.A.b(3)(b), ECF No. 49-15, but that warning explicitly referred to searches conducted by "[t]he University and its employees." *Ibid.* Weiss certainly was on notice that the University computers that he used might be searched by University personnel suspecting that evidence of cyber misconduct might be found. It does not automatically follow from the policy language, however, that Weiss should have expected that police would be able to access his accounts and computers without complying with the generally applicable requirements of the Fourth Amendment. Although the government argues correctly that UMITS properly could seize and inspect some of the University-owned devices used by Weiss, it cannot say that Weiss's expectation of privacy was so diminished that he could not challenge an invalid search or seizure by law enforcement.

The government heavily relies on *United States v. Angevine*, 281 F.3d 1130 (10th Cir. 2002), a case describing similar conduct by law enforcement officers searching a university-owned computer but different university-published computer-use policies. Defendant Angevine, a university professor, was charged with possession of child pornography after pornographic images were discovered on his university-owned computer. *Id.* at 1132. Angevine moved to suppress the images discovered on the computer, and the district court denied the motion, reasoning that his university's computer-use policy extinguished his expectation of privacy. *Ibid.* The appellate court affirmed, largely based on the extensive disclaimers and warnings accompanying access to the device. *Id.* at 1134-35. The University's policies stated that, among other things, all data on university devices was considered university property, "[t]he University cannot guarantee confidentiality of stored data," information transmitted through the internet "will not necessarily

- 14 -

remain confidential," and the University maintained a "right of access to the contents of stored computing information at any time for any purpose which it has a legitimate 'need to know.'" *Id.* at 1132-33.  The defendant also was greeted with a disclaimer every time he logged in warning of penalties for use of computers in any way contrary to applicable statutes or policies, and reminding him that "all electronic mail messages are presumed to be public records and contain no right of privacy or confidentiality" unless state or federal statutes provided otherwise.  *Id.* at 1133.  The court found that "[r]easonable people in Professor Angevine's employment context would expect University computer policies to constrain their expectations of privacy in the use of University-owned computers."  *Id.* at 1335.  The court also commented that Angevine had made a "careless effort to maintain a privacy interest" because he downloaded the pornography through a university-monitored network, which he was warned was "'fairly easy to access' by third parties."  *Ibid.*

This case presents some similarities to *Angevine*.  Both defendants were university employees who allegedly used college-issued computers to engage in illegal conduct.  And both schools' computer use policies warned that the privacy of computer records could not be guaranteed.  The similarities stop there, however.  The University of Michigan's statements regarding users' expectations of privacy are more limited than those in *Angevine*.  For instance, the policy in *Angevine* reserved the right to access computer data "at any time for any purpose which it has a legitimate 'need to know.'" 281 F.3d at 1132.  The University of Michigan policy the government relies on states that "[t]he University and its employees will not access or monitor the content of personal records" except when necessary to identify certain "business records" or "[w]hen there is reasonable cause to believe that the employee has engaged in misconduct and may have used University resources improperly."  Standard Practice Guide 601.11, § III.A.b(3)(b), ECF No. 49-15 (emphases removed).  The grant of authority to the University of Michigan to review

- 15 -

so-called "personal records" is much narrower than the any-time, any-legitimate-purpose standard referenced in *Angevine*. Moreover, the University of Michigan does not claim that data on University-owned devices is University property, and its policies do not suggest that "network administrators and others were free to view data downloaded from the internet." *See Angevine*, 281 F.3d at 1134-35. The court in *Angevine* concluded that the relevant computer-use policies put the defendant on notice that he had no expectation of privacy in his University computer, but the same cannot be said for Weiss and the University of Michigan policy announcements. And the splash warning prohibiting the use of university-owned devices for illegal purposes does not by itself undercut a reasonable expectation that illegal use would not be kept private, considering the University's policy language. Weiss reasonably could have expected that discipline or prosecution was more likely if someone searched his devices, but a splash warning admonishing him to obey University policies and follow the law would not necessarily cause him to believe that his device was less private than it otherwise would have been.

Other factors suggest that Weiss had a reasonable expectation of privacy in the University-owned devices as well. He says, without contest, that he was the exclusive user of several of the university-owned devices — his office desktop computer, his work cell phone, and his iPad — and that these devices were password-protected. Weiss Dec., ECF No. 49-14, PageID.518-19. The electronic password calls to mind the locked safe in a public employee's office, which the Sixth Circuit has held is entitled to a reasonable expectation of privacy. *James*, 592 F. App'x at 456; *see also Leventhal v. Knapek*, 266 F.3d 64, 73 (2d Cir. 2001) (holding that government employee had a reasonable expectation of privacy in the contents of his office computer where he had exclusive use of it and his employer had no policy of conducting routine searches of office computers). Weiss also avers that he stored both personal and professional items on these

computers, *see* ECF No. 49-14, PageID.518-19, similar to the mix of private and work-related materials that Dr. Ortega kept in his office in *O'Connor*, 480 U.S. at 718-19.

Of the three desktop computers in Schembechler Hall that UMITS turned over to UMPD, one was in Weiss's personal office, a second was in the quarterbacks' meeting room, and a third was in the tight ends' meeting room. Weiss does not contend that he had exclusive use of the two computers located in shared spaces, and he allegedly logged into at least one of them with an account shared among multiple University of Michigan football coaches. *See* ECF No. 32-7, PageID.221. Still, the Supreme Court has recognized a reasonable expectation of privacy under similar circumstances in *Mancusi*, 392 U.S. at 369, where the defendant shared an office with several of his coworkers. The Court recognized that defendant DeForte could challenge a search of a personal private office, and "the situation was not fundamentally changed because DeForte shared an office with other union officers. DeForte still could reasonably have expected that only those persons and their personal or business guests would enter the office, and that records would not be touched except with their permission or that of . . . higher-ups." *Ibid.* The same can be said here: although other members of the coaching staff might have had access to the desktop computers, that does not mean that Weiss would have expected persons outside of the football program to access them, let alone law enforcement.

The government also advances a bolder argument that Weiss had no expectation of privacy whatsoever regarding the desktop computers stored in Schembechler Hall because that expectation was "extinguished once UMITS exercised its rightful authority and took physical possession of them." ECF No. 32, PageID.168-69. But that argument collides directly with the holding in *Riley v. California*, 573 U.S. 373, 401 (2014), that "a warrant is generally required before [searching a cell phone], even when a cell phone is seized incident to an arrest." And by "warrant," one can

assume that the Court intended to mean a *valid* search warrant. The notion that a person must have custody or possession of the thing being searched to have a reasonable expectation of privacy in it also is inconsistent with *O'Connor*, which held that a hospital employee had a reasonable expectation of privacy in his office and the files therein, even though the doctor was barred from hospital grounds at the time the search occurred. *See* 480 U.S. at 712-13.

The University-owned computers were accessible only to Weiss, or, in some cases, to him and his colleagues. And the University's IT policies only authorized limited inspections of the devices. Therefore, Weiss had a subjective expectation of privacy in the devices that were not extinguished by the University's computer use policies or by the splash warnings. And for these same reasons, that expectation was reasonable.

### III.

Weiss contends that the evidence discovered on his electronic devices must be suppressed because the search warrants obtained by the UMPD violate the Fourth Amendment's particularity requirement and the ensuing searches were unconstitutional. The government offers many arguments that the data in the devices is admissible *notwithstanding* the alleged defects in the UMPD's warrants, but it does not dispute or meaningfully respond to Weiss's arguments about their lack of particularity. Nonetheless, a brief discussion of the defects in the state search warrants is necessary.

### A.

"The Fourth Amendment was a response to the English Crown's use of general warrants, which often allowed royal officials to search and seize whatever and whomever they pleased while investigating crimes or affronts to the Crown." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). Hence, the "manifest purpose" of the Amendment's mandate that a search warrant must

- 18 -

"particularly describing the place to be searched and the persons or things to be seized," U.S. Const. amend. IV, "was to prevent general searches." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). The search warrant must be tied to the probable cause that authorized it. "By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Ibid.*

"The 'degree of specificity required' to satisfy the particularity requirement is 'flexible and will vary depending on the crime involved and the types of items sought.'" *United States v. Demasi*, 715 F. Supp. 3d 1009, 1017 (E.D. Mich. 2024) (quoting *United States v. Richards*, 659 F.3d 527, 537 (6th Cir. 2011)). "Consequently, a description is valid if it is as specific as the circumstances and the nature of the activity under investigation permit." *Ibid.* (quoting *Greene*, 250 F.3d at 477) (internal quotation marks omitted). Put another way, "[t]he proper metric of sufficient specificity is whether it was reasonable to provide a more specific description of the items at that juncture of the investigation." *Richards*, 659 F.3d at 541 (quoting *United States v. Meek*, 366 F.3d 705, 716 (9th Cir. 2004)).

In the context of computer searches, failing to specify the category of files or documents to be searched is not necessarily fatal if the warrant's limits direct officers to search for evidence of a specific crime. *See, e.g.*, *United States v. Underwood*, 129 F.4th 912, 936 (6th Cir. 2025) ("The search of an entire personal device for evidence of a *specific type of criminal activity* is permissible.") (emphasis added); *Richards*, 659 F.3d at 541-42 (holding that warrant "was not unconstitutionally overbroad" where it "was restricted to a search for evidence of child pornography crimes and did not permit a free-ranging search"). Similarly, failure to include a

specific timeframe for files to be searched is not fatal if the warrant is limited by category of documents or subject matter of evidence. *United States v. Sullivan*, 751 F. App'x 799, 804-05 (6th Cir. 2018) ("[E]ven though [portions of the warrant] do not contain a time limitation, their subject-matter limitation . . . fulfills the same function as a time limitation would have done, by limiting the warrant to evidence of the crimes described in the affidavit." (quoting *United States v. Ford*, 184 F.3d 566, 578 (6th Cir. 1999)).  But a warrant that contains no date limitation *and* no subject-matter limitation is overbroad and violates the Fourth Amendment.  *See Demasi*, 715 F. Supp. 3d at 1017-18 (holding that search warrant was insufficiently particular where it authorized search of all records kept on paper or digital devices without further limitation); *see also In re 650 Fifth Ave. & Related Props.*, 934 F.3d 147, 163 (2d Cir. 2019) ("This warrant is facially deficient. It does not even arguably include a reference to the . . . alleged crimes or a temporal scope for the items to be seized.").

That is the defect in the state search warrants here.  They called for a full forensic search of the electronic devices and included no limiting language that tied the authorization to the probable cause that was presented in the applications and affidavits.  The categories of items to be searched are so numerous and broadly defined that they effectively permit a general search of the devices in their entirety.  The search warrants contain no date limitations, and they do not authorize a search for a specific type of criminal activity.  They do not direct executing officers to search, for instance, for files related to specific alleged victims or for evidence of misappropriated personal data.  *Cf. Underwood*, 129 F.4th at 936 (finding that warrant authorizing search of "[a]ny electronic data within the aforementioned phones . . . *that would be evidence of drug trafficking*" satisfied particularity requirement).  The UMPD's forensic search warrants are similar to those that other courts have invalidated for want of particularity.  *See, e.g., In re 650 Fifth Ave. & Related Props.*,

934 F.3d at 163; *United States v. Santiago*, 135 F.4th 1235, 1239-40 (10th Cir. 2025) (holding that warrant authorizing search of defendant's iPhone without reference to the alleged crimes was "a classic example of the kind of general search the Fourth Amendment is intended to prevent").

The lack of particularity in UMPD's forensic search warrants renders them unconstitutional general warrants.

B.

Weiss contends that the same evidence that the FBI obtained through its search warrant must be suppressed because it is the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963) ("We need not hold that all evidence is fruit of the poisonous tree simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.") (cleaned up). The exclusionary rule calls for the suppression of "both the primary evidence obtained as a direct result of an illegal search or seizure and, relevant here, evidence later discovered and found to be derivative of an illegality, the so-called fruit of the poisonous tree." *Utah v. Strieff*, 579 U.S. 232, 237 (2016) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)) (cleaned up).

"In the typical 'fruit of the poisonous tree' case . . . the challenged evidence was acquired by the police *after* some initial Fourth Amendment violation, and the question before the court is whether the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the 'taint' imposed upon that evidence by the original illegality." *United States v. Crews*, 445 U.S. 463, 471 (1980). "Thus most cases begin with the premise that the challenged evidence is in some sense the product of

illegal governmental activity." *Ibid.* In some cases, however, that premise is incorrect, and the fruit-of-the-poisonous-tree doctrine is inapplicable because the evidence was not the "product of any police misconduct." *Ibid.* The government argues that this is one of those latter cases. It argues that because it obtained the evidence Weiss seeks to suppress pursuant to the FBI's federal warrant, which was supported by a showing of probable cause based on facts that existed prior to the UMPD's searches, the evidence is not fruit of the poisonous tree at all.

Weiss bears the initial burden of demonstrating that evidence to be used against him was the fruit of an illegal search. *Alderman v. United States*, 394 U.S. 165, 183 (1969); *Nardone v. United States*, 308 U.S. 338, 341 (1939). The defendant must "go forward with specific evidence demonstrating taint." *Alderman*, 394 U.S. at 183. But once "an illegal search has come to light, [the government] has the ultimate burden of persuasion to show that its evidence is untainted." *Ibid*. Both parties must meet their respective burdens by a preponderance of the evidence. 3A Wright & Miller's Federal Practice & Procedure § 688 (4th ed. Apr. 2026 update).

Weiss has carried that initial burden here, because the cyber evidence "was acquired by the police after [an] initial Fourth Amendment violation . . . ." *Crews*, 445 U.S. at 471 (emphasis removed). The UMPD first discovered the challenged evidence in forensic searches that it conducted under the authority of facially invalid search warrants. The challenged evidence was, by definition, "the product of . . . police misconduct." *Ibid.* The government's argument that it obtained the same evidence later through a separate warrant does not change that reality. The essence of that argument is that the "evidence [was] initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality." *Murray v. United States*, 487 U.S. 533, 537 (1988). The government's argument bears on whether the evidence should be admissible *notwithstanding* the initial illegal

search because it was obtained through a lawful "independent source," *see ibid.* — not whether the evidence initially was obtained as the result of a Fourth Amendment violation, or whether there was a connection between the illegal search and the evidence Weiss seeks to suppress.

Because Weiss has carried his burden, the government now must show "that its evidence is untainted." *Alderman*, 394 U.S. at 183. The government offers three reasons that the initial taint has been purged: that it "learn[ed] of the evidence from an independent source," that "the connection with the unlawful search [was] so attenuated as to dissipate the taint," and that "the evidence would inevitably have been discovered" regardless of the illegal search, *United States v. McClain*, 444 F.3d 556, 564 (6th Cir. 2005) (cleaned up), although it does not specifically invoke these exceptions by name.

1.

Consider first the government's argument that it acquired the evidence through a warrant untainted by the first illegal search. This is an independent source argument in substance. "[T]he independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source." *Strieff*, 579 U.S. at 238. (citing *Murray*, 487 U.S. at 537). Evidence obtained in an unconstitutional search is still admissible if "the government can show that it was discovered through sources 'wholly independent of any constitutional violation.'" *United States v. Leake*, 95 F.3d 409, 412 (6th Cir. 1996) (quoting *Nix v. Williams*, 467 U.S. 431, 443 (1984)). The doctrine is based on the idea that "the government should not profit from its illegal activity, [but] neither should it be placed in a worse position than it would otherwise have occupied." *Murray*, 487 U.S. at 542.

To benefit from this rule, "the government must make two showings by a preponderance of the evidence." *United States v. Williams*, 656 F. App'x 751, 753 (6th Cir. 2016). "First, the

government must show that the initial illegal search did not prompt officers to seek a warrant for the second search." *Ibid.* (citing *Murray*, 487 U.S. at 542)). "This is a fact-based inquiry that requires the district court to assess the record." *Ibid.* (citing *Murray*, 487 U.S. at 540 n.2). While law enforcement testimony is relevant, "the Supreme Court has instructed district courts not to give dispositive effect to officer assurances that a warrant would have been sought in the absence of the illegal search. Instead, '[w]here the facts render [officer] assurances implausible, the independent source doctrine will not apply.'" *Ibid.* (quoting *Murray*, 487 U.S. at 540 n.2). Second, the government also "must show that a neutral magistrate would have issued the search warrant even if she was not presented with the information obtained from the illegal search." *Ibid.* (citing *United States v. Jenkins*, 396 F.3d 751, 761 (6th Cir. 2005)). To determine whether the government has met this burden, the Court must excise all illegally obtained evidence from the affidavit supporting the warrant and then "'decid[e] whether the remaining *legally* obtained information sufficiently supports a finding of probable cause to search.'" *Ibid.* (quoting *Jenkins*, 396 F.3d at 761).

The second part of the test is easily met. The affidavit supporting the federal search warrant contains no information derived from the state-authorized searches. And that affidavit relied only on evidence that was known before the UMPD's forensic searches. *See Segura v. United States*, 468 U.S. 796, 799 (1984) (holding that "the [search] warrant and the information on which it was based were unrelated to the [prior illegal] entry and therefore constituted an independent source for the evidence."); *United States v. Karo*, 468 U.S. 705, 719 (1984) ("However, if sufficient untainted evidence was presented in the warrant affidavit to establish probable cause, the warrant was nevertheless valid.")

However, the government stumbles over the first part of the test. *Murray v. United States*, decided after *Segura* and *Karo*, makes clear that the independent source doctrine may not apply *even if* the application for the warrant contained no information from an earlier illegal search. 487 U.S. at 542-43. In *Murray*, federal agents entered a warehouse without a warrant and discovered bales of marijuana. *Id.* at 535. They then applied for a warrant and "did not include in their application for a warrant any recitation of their observations" from inside the warehouse. *Id.* at 543. The record was clear that the evidence from the earlier search was not presented to the magistrate, and it therefore had no effect on the magistrate's decision to issue a warrant. *Ibid*. But remand was necessary because the district court "did not . . . explicitly find that the agents would have sought a warrant if they had not earlier entered the warehouse." *Ibid.*

Under *Murray*, and contrary to the government's assertions, for the independent source doctrine to apply, the government must show that "no evidence obtained in the initial unlawful search 'prompted' the subsequent lawful search" *in addition to* demonstrating that "the improperly obtained evidence didn't affect the magistrate's 'decision to issue the warrant.'" *Davis v. United States*, No. 21-5967, 2022 WL 14177205, at *2 (6th Cir. June 17, 2022) (quoting *Murray*, 487 U.S. at 542)). Nonetheless, the government offers two reasons why *Murray*'s prompting inquiry is not necessary in this case. Neither is persuasive.

First, the government observes that *United States v. Santiago* — a case decided by the Tenth Circuit last year — determined whether a federal warrant was tainted by the fruits of an overbroad state warrant by excising the tainted information from the warrant application and considering whether the federal warrant still was supported by probable cause. 135 F.4th at 1240-41. The government apparently reads *Santiago* to say that the *only* inquiry relevant to the independent source doctrine is whether probable cause would exist for the search absent the tainted

evidence. But the court never reached the "prompting" inquiry because the second warrant was not supported by probable cause after the illegally obtained evidence was excised from the affidavit. 135 F.4th at 1241. The government also relies on *United States v. Jenkins*, 396 F.3d 751 (6th Cir. 2005), for the same point. But *Jenkins* itself acknowledged that prompting was part of the inquiry under *Murray*. *Id.* at 758 ("If the application for a warrant 'contains probable cause apart from the improper information, then the warrant is lawful and the independent source doctrine applies, *providing that the officers were not prompted* to obtain the warrant by what they observed during the initial entry.'" (quoting *United States v. Herrold*, 962 F.2d 1131, 1141-42 (3d Cir. 1992)) (emphasis added). Neither case holds that *Murray*'s prompting inquiry is unnecessary where, as here, the defendant has argued and submitted evidence to show that the decision to seek a warrant was influenced by an earlier illegal search.

Second, the government contends that courts only have found *Murray*'s prompting inquiry necessary "when a warrantless search is linked to a warrant obtained by that same agency as part of a single, continuing operation — with either the explicit or implicit inference being that the warrantless search may have been purposefully seeking evidence to support the latter search warrant." ECF No. 32, PageID.175. No language in *Murray* limits its holding to cases in which the first and the second search were conducted by the same agency, although the case discusses "'confirmatory' searches" conducted for the purpose of "determin[ing] whether it is worthwhile to obtain a warrant." *Murray*, 487 U.S. at 546-47 (Marshall, J., dissenting); *id.* at 539 (majority opinion) (discussing petitioners' concerns that "law enforcement officers will routinely enter without a warrant to make sure that what they expect to be on the premises is in fact there."); *see also Williams*, 656 F. App'x. at 754 (affirming suppression of evidence under prompting theory where "officers illegally searched McCormick Place in order to gather probable cause for the

- 26 -

subsequent warrant"). The government suggests that *Murray*'s prompting analysis should not be applied in factual situations where there is no risk that officers have conducted a "confirmatory" search of the kind discussed in *Murray*.

Although it is unlikely that the UMPD's forensic searches were "confirmatory"— there is no implication in this case that the UMPD sought a warrant for the purpose of informing the FBI's choice to get its own warrant — applying *Murray*'s prompting rule in this instance would still deter unlawful police conduct and therefore would be consistent with the exclusionary rule's rationale. The Supreme Court has long recognized that state officers would have less incentive to comply with constitutional requirements if they knew that evidence seized under an illegal search later could be used in federal court. *See Elkins v. United States*, 364 U.S. 206, 221-22 (1960). For this reason, the Supreme Court abolished the so-called "silver platter" doctrine, which allowed the fruits of unlawful state searches to be used in federal trials. *Id.* at 208. Adopting the government's proposed limitation on *Murray* would effectively revive the silver platter doctrine by rendering any evidence illegally obtained by state or local law enforcement admissible in federal court if the government sought a federal warrant for the same illegally obtained evidence, even when it was prompted to look for it because of prior police illegality.

The "prompting" part of the independent source test applies to the facts here, and the government must show, by a preponderance of the evidence, that "the initial illegal search did not prompt officers to seek a warrant for the second search." *Williams*, 656 F. App'x at 753 (citing *Murray*, 487 U.S. at 542). In determining whether the second search was "prompted" by the first, "what counts is whether the actual illegal search had any effect in producing the warrant . . . ." *Murray*, 487 U.S. at 542 n.3.

The government cannot show that the initial illegal search had no effect in producing the FBI's federal warrant. There is extensive evidence that the UMPD shared information with the FBI about the results of its unlawful forensic searches before the FBI sought its own search warrant. A February 9, 2023 correspondence from the UMPD to an FBI representative describes certain information obtained during the UMPD's forensic searches, including a spreadsheet containing information pertaining to students from "over 30 different universities" and a "large amount of thumbcache photos, containing pictures of victims and or [sic] personally identifiable information." ECF No. 58-1, PageID.582. Special Agent Reller's notes from a discussion with UMPD officer Thomas Cargill on February 17, 2023 contain additional information about the devices and some of the content that the UMPD extracted from them. *See* ECF No. 58-3. It also is possible (perhaps likely) that the UMPD officers shared further information about the results of the forensic searches verbally in meetings with the FBI on February 10 and February 27. *See* ECF No. 49-3, PageID.504; ECF No. 49-5, PageID.507. Information obtained from the searches explicitly was discussed in Special Agent Reller's memorandum in support of opening an FBI investigation, *see* ECF No. 58-5, PageID.598, after which it sought the federal search warrant.

It is beyond peradventure that this evidence played some role in the FBI's decision to seek a search warrant for the information and "pitch" that case to the United States Attorney. Consider the fund of knowledge that existed before the searches: the UMPD knew about 46 unauthorized logins connected to computers used by Weiss in the span of a few days. *See* Warrant Affidavit, ECF No. 32-3, PageID.188-90. These accounts all were associated with alumni of one university. *Ibid.* But, as illustrated above, the information obtained in the forensic searches showed that the alleged hacking targeted many more victims at many more universities across multiple states. It also revealed that the devices contained far more incriminating evidence than the unauthorized

login attempts alone would have suggested, including nude photographs and victims' social security numbers.  ECF No. 58-3, PageID.587.  Weiss's alleged criminal scheme would have appeared much more serious and wide-ranging with the evidence discovered in the searches than without it.  While it is impossible to know for certain whether the FBI would have opened a federal investigation and sought a federal warrant if it never had been informed of the evidence obtained in the searches, it is fair to say that the FBI's knowledge of the evidence made it more likely to pursue the investigation than it would have been otherwise.  Since it is unlikely that the results of the UMPD's forensic searches did not have "any effect in producing the warrant," *Murray*, 487 U.S. at 542 n.3, the government has not carried its burden of showing that the FBI's warrant was not prompted by the results of the UMPD's illegal search, *Williams*, 656 F. App'x at 753.

2.

The government does not invoke the inevitable discovery doctrine by name, but it argues that eventually the federal authorities would have investigated Weiss and sought a warrant to search the devices, even if the UMPD never conducted the forensic searches.  "[T]he inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source."  *Strieff*, 579 U.S. at 238 (citing *Nix*, 467 U.S. at 443-44).  "The doctrine flows from the deterrence goals underpinning the exclusionary rule itself: If the same evidence surely would have been found without the illegality, 'then the deterrence rationale has so little basis that the evidence should be received.'"  *United States v. Cooper*, 24 F.4th 1086, 1091 (6th Cir. 2022) (quoting *Nix*, 467 U.S. at 444).  The Sixth Circuit has recognized two situations where the inevitable discovery doctrine applies: (1) when there was "an independent, untainted investigation that was bound to uncover the same evidence"; and (2) when "other compelling facts demonstrate that discovery was inevitable."  *Ibid.* (cleaned up).  The relevant

inquiry is whether, "[v]iewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred[?]'" *Id.* at 1092 (quoting *United States v. Kennedy*, 61 F.3d 494, 498 (6th Cir. 1995)) (first alteration added). Although this hypothetical "inherently requires some conjecture, courts must keep speculation at a minimum by focusing on demonstrated historical facts capable of ready verification or impeachment." *Id.* at 1094 (cleaned up). "The government bears the burden of showing that the exception applies." *Id.* at 1091 (citing *Nix*, 467 U.S. at 444).

*Nix v. Williams*, where the unlawful police interrogation of the defendant led police to the corpse of a murder victim, is the seminal case for this doctrine. The Court held that the evidence related to the discovery of the victim's body properly was admitted at trial because it found that the body inevitably would have been discovered by one of the search parties if the defendant had not identified it first. 467 U.S. at 449-50 ("On this record it is clear that the search parties were approaching the actual location of the body, and we are satisfied . . . that the volunteer search teams would have resumed the search had [the defendant] not earlier led the police to the body and the body inevitably would have been found."). The doctrine has been applied "when the evidence would have been discovered pursuant to a 'routine procedure,' such as an airline's standard policy of opening lost luggage." *Cooper*, 24 F.4th at 1091 (quoting *Kennedy*, 61 F.3d at 500).

Most pertinent here, the doctrine also "has repeatedly been employed when, after seizing evidence during an illegal search, police obtain and execute a search warrant based on probable cause developed before the illegal search." *Ibid.* (citations omitted). "As long as the evidence discovered during the illegal search would have been discovered during a later legal search, and the second search inevitably would have occurred in the absence of the first, then the evidence may be admitted." *Ibid.* (cleaned up).

- 30 -

The government offers two reasons that the evidence discovered in the forensic searches inevitably would have been discovered: (1) the facts uncovered by UMITS before the searches are similar to those that led to a different federal investigation in the past; and (2) it received a hacking complaint from Keffer Development Services (an alleged victim) that the FBI determined was connected with Weiss later in its investigation.

The government's first theory is too speculative to establish that the evidence obtained pursuant to the UMPD warrants inevitably would have been discovered. Inevitable discovery cases usually involve a fairly simple inference — for instance, that one of several search parties eventually would have found a body, *Nix*, 467 U.S. at 449-50, or that contraband necessarily would have been found in a routine luggage search and then reported to police, *Kennedy*, 61 F.3d at 500-01. But the government's argument that the FBI would have sought a federal warrant based solely on the facts that existed before the UMPD performed the search require the Court to make at least two factual inferences in the FBI's favor: (1) that UMITS or the UMPD necessarily would have passed the information on to the FBI if the UMPD had not searched Weiss's devices, and (2) that the FBI would have initiated an investigation and sought a warrant based on that information. The government has not offered evidence sufficient to conclude that either of these things would have happened in the absence of the UMPD's search. Perhaps information about the hacking attempts would inevitably have made its way to the FBI if there was evidence that the UMPD or UMITS involved the FBI in the early stages of computer crime investigations as a routine practice. But the record contains no such evidence. And the fact that the UMPD sought search warrants and began a forensic search without the FBI's involvement suggests the opposite. Even if the UMPD inevitably would have contacted the FBI in the absence of the searches, it is not inevitable that the FBI would have seen fit to spend scarce federal resources on the investigation if it were only aware

of the logins in December 2022.  Only after the UMPD's forensic searches was it learned that Weiss's alleged hacking was far more wide-ranging.  The evidence submitted by the government does not establish that UMITS's discovery of the unauthorized login attempts would have ripened into a full federal investigation if the UMPD never conducted the forensic searches.

Nor does the tip from Keffer Development Services suggest that the FBI inevitably would have sought a search warrant.  Keffer submitted a tip to the FBI complaining of possible computer hacking on August 15, 2020.  ECF No. 33-3.  The FBI apparently linked Weiss to Keffer's complaint only after reviewing the evidence obtained through the UMPD's iCloud warrant (discussed below).  ECF No. 32, PageID.178-79.  However, the government's assurances that it "would inevitably have acted on certain leads" do not establish that evidence inevitably would have been discovered if "the police did not in fact take action on those leads in a 'reasonably timely manner.'" *Ford*, 184 F.3d at 576 (quoting *Leake*, 95 F.3d at 418 n.17).  The existence of the Keffer tip itself does not establish inevitable discovery because the FBI has not pointed to any evidence that it acted upon the lead before it began its investigation into Weiss approximately two-and-a-half years later.  Moreover, the FBI apparently connected Weiss to this tip using the evidence obtained through the UMPD's iCloud warrant, but it is not clear that the FBI would have come into possession of that evidence had it not begun the investigation into Weiss based on the UMPD's referral.  For reasons already discussed, it is not inevitable that the UMPD's referral, or the FBI's investigation into Weiss, would have happened at all if it were not for the UMPD's forensic search.  Without further evidence that Keffer's cybercrime complaint would have ripened into an investigation of Weiss in the absence of the UMPD forensic search warrants, the government cannot meet its burden that the evidence inevitably would have been discovered.

3.

The government does not invoke the attenuation doctrine specifically, but it does make arguments suggesting that it might apply. The doctrine posits that "but-for causality is only a necessary, not a sufficient, condition for suppression." *Hudson v. Michigan*, 547 U.S. 586, 592 (2006). Thus, evidence that could be characterized as fruit of the poisonous tree still is admissible "when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Strieff*, 579 U.S. at 238 (quoting *Hudson*, 547 U.S. at 591).

"The Supreme Court has set forth three factors to guide the attenuation inquiry: 'the temporal proximity of the unlawful [conduct] and the emergence of the incriminating evidence at issue, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct.'" *United States v. Waide*, 60 F.4th 327, 339 (6th Cir. 2023) (quoting *United States v. Williams*, 615 F.3d 657, 669 (6th Cir. 2010)); *see Strieff*, 579 U.S. at 239 (applying same factors). The government does not address these factors, despite having the burden of persuasion to establish attenuation. *See United States v. Lopez-Arias*, 344 F.3d 623, 630 (6th Cir. 2003). And it is not clear that the government has invoked the attenuation doctrine at all. But in all events, the attenuation factors do not favor the government.

The first factor, the temporal distance between the unlawful conduct and the "emergence of the incriminating evidence," *Waide*, 60 F.4th at 339, weighs against the government. As Weiss observes in his reply brief, the evidence at issue initially was found during forensic searches authorized by the invalid warrants. *See* ECF No. 49, PageID.491. For this reason alone, it is doubtful that the attenuation doctrine could apply at all. *See Cooper*, 24 F.4th at 1095-96 ("The

- 33 -

gun was seized during the initial unlawful search, so inevitable discovery, not attenuation, is the right tool for the job.").

The second factor, intervening circumstances, also weighs against attenuation. The government seems to argue that the FBI's decision to seek a search warrant was an intervening event that broke the causal chain between the UMPD's forensic search warrants and the evidence that Weiss seeks to suppress. The attenuation doctrine typically requires some "intervening spontaneous action" distinct from the government's illegal conduct that results in the discovery of the evidence. *Waide*, 60 F.4th at 340 (quoting *Williams*, 615 F.3d at 669). In *Streiff*, for example, an officer stopped the defendant, arrested him after a dispatcher reported an outstanding arrest warrant, and discovered methamphetamine during the search incident to the arrest. 579 U.S. at 235-36. The Court assumed without deciding that the initial stop was unlawful, *id.* at 239, but it found that the arrest warrant was an intervening circumstance that attenuated the connection between the stop and the discovery of evidence because "the warrant was valid, it predated [the officer's] investigation, and it was entirely unconnected with the stop," *id.* at 240-41. In contrast, the FBI's warrant in this case did not predate the initial illegal searches, and it was not "entirely unconnected" with them. *See ibid.* The FBI sought the warrant with knowledge of the prior illegal search and much of what it had uncovered. The FBI's search warrant was not an intervening circumstance that weighs in favor of applying the attenuation doctrine.

The third factor, the purpose and flagrancy of the misconduct, again weighs against the government. "The Supreme Court has explained that the purposefulness factor is met when the unlawful action is investigatory, that is, when officers unlawfully act in the hope that something might turn up." *Waide*, 60 F.4th at 340 (cleaned up); *see Brown v. Illinois*, 422 U.S. 590, 605 (1975). The UMPD's searches under the defective search warrants certainly were "investigatory"

- 34 -

in nature; their sole purpose was to find evidence of suspected crimes. And the Supreme Court has cautioned that this factor "favor[s] exclusion only when the police misconduct is most in need of deterrence — that is, when it is purposeful or flagrant." *Strieff*, 579 U.S. at 241. The parties' briefing does not address whether the UMPD's conduct could be considered purposeful or flagrant for the purposes of the attenuation test. But this factor disfavors the government because "[t]he execution of a plainly unconstitutional warrant is included in the kind of police misconduct the exclusionary rule seeks to deter," *Santiago*, 135 F.4th at 1240, and executing such a search warrant in some circumstances reflects a "grossly negligent disregard for Fourth Amendment rights," *650 Fifth Ave. & Related Props.*, 934 F.3d at 164 (quoting *Davis v. United States*, 564 U.S. 229, 238 (2011)). The third factor does not support attenuation because the UMPD conducted the search for investigatory purposes, and it did so with a facially invalid warrant.

The attenuation doctrine will not preclude application of the exclusionary rule.

C.

In its final effort to salvage the cyber evidence seized from the digital devices, the government invokes the good faith doctrine, which holds that the exclusionary rule's deterrent effect should focus on the police, not on magistrates who may make mistakes in assessing probable cause. *United States v. Leon*, 468 U.S. 897, 916 (1984) (positing that "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates"). "Following *Leon*, courts presented with a motion to suppress claiming a lack of probable cause must ask 'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's decision.'" *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017) (quoting *United States v. Hodson*, 543 F.3d 286, 293 (6th Cir. 2008)). "Only when the answer is 'yes' is suppression appropriate." *Ibid.*

Here, the problem with the searches is not a want of probable cause; instead, it is that the search warrant itself was a prohibited general warrant that lacked particularity.  The good-faith doctrine does not apply where "a warrant [is] so facially deficient — i.e., in failing to particularize the place to be searched or the things to be seized — that the executing officers cannot reasonably presume it to be valid."  *Leon*, 468 U.S. at 923.  "Given that the particularity requirement is set forth in the text of the Constitution, no reasonable officer could believe that a warrant that plainly did not comply with that requirement was valid."  *Groh v. Ramirez*, 540 U.S. 551, 563 (2004); *see also Demasi*, 715 F. Supp. 3d at 1020 ("[W]arrants that are constitutionally overbroad for lacking particularity in defining the place to be searched and things to be seized are textbook examples of facially deficient warrants which officers cannot reasonably rely on in good faith.").

Weiss contends that the state search warrants fit that bill.  The government does not contest Weiss's position that the UMPD warrants were so facially deficient that no reasonable officer could believe they were valid.  Rather, it relies on other factors suggesting the officers' good faith.

First, the government asserts that the affidavits supporting the search warrants were detailed and particularized and therefore cure the particularity problems with the search warrants themselves.  It is true that the affidavits establish probable cause for a particularized search warrant to issue.  *See* ECF No. 32-3, PageID.190; ECF No. 32-4, PageID.196 ("Based on my investigation I believe that there is probable cause that evidence associated to [sic] the unauthorized access could be found on [the devices].")  And "a court may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant."  *Groh*, 540 U.S. at 557-58 (collecting cases).  But the search warrants here do not incorporate the affidavits or even reference them at all.  So even though the affidavits can be read to cabin the scope of the searches to "evidence associated to [sic] the

unauthorized access," ECF No. 32-3, PageID.190; ECF No. 32-4, PageID.196, the lack of incorporation by reference means that the affidavits cannot cure the warrants' lack of particularity. *See United States v. Perez*, 629 F. App'x 699, 703 (6th Cir. 2015) (observing that a "warrant's lack of incorporation by reference alone is sufficient to conclude that the Court may not utilize the affidavit" in assessing particularity).

Next, the government argues that the good faith exception applies because the searches were "not a free-ranging inquiry but particularized and targeted towards gathering evidence of the criminal activity described in the affidavits." ECF No. 32, PageID.180.  That is, even though the search warrant was overbroad, the officers themselves decided to limit their searches.  The Supreme Court rejected essentially the same argument in *Groh*.  There, several ATF agents, including the petitioner, searched the respondent's house under a warrant that contained no description of the items to be seized. *Groh*, 540 U.S. at 554-55.  The warrant application, however, contained far more detail, specifying that the purpose of the search was to identify weapons, explosives, and receipts related to the purchase or manufacture of weapons or explosives. *Ibid.* The petitioner argued that the search was reasonable, notwithstanding a facially deficient warrant, "because the scope of the search did not exceed the limits set forth in the application." *Id.* at 560. The Court disagreed, reasoning that "[t]he mere fact that the Magistrate issued a warrant does not necessarily establish that he agreed that the scope of the search should be as broad as the affiant's request." *Id.* at 561.  "[U]nless the particular items described in the affidavit are also set forth in the warrant itself (or at least incorporated by reference, and the affidavit [is] present at the search), there can be no written assurance that the Magistrate actually found probable cause to search for, and to seize, every item mentioned in the affidavit." *Id.* at 560.  So, "[e]ven though petitioner acted with restraint in conducting the search," the breadth of the warrant meant that "'this restraint

was imposed by the agents themselves, not by a judicial officer.'"  *Id.* at 561 (quoting *Katz v. United States*, 389 U.S. 347, 356 (1967)).  The *Groh* Court also denied qualified immunity, which it observed involves "the same standard of objective reasonableness" as the good faith doctrine, *id.* at 565 n.8 (quotation marks omitted), because the warrant was so facially deficient that officers could not presume it to be valid, *id.* at 565.

The same considerations apply here.  Even assuming that the UMPD limited its forensic search to evidence of the crimes referenced in the application — namely, evidence of unauthorized computer access — there can be no assurance that a neutral magistrate actually found probable cause for everything that was searched and seized.  The purportedly restrained nature of the UMPD's search does not cure the lack of particularity in the warrant where, as in *Groh*, it is undisputed that the warrant is so lacking in particularity that no officer reasonably could rely upon it.

For the same reason, the government's reliance on two Second Circuit cases applying the good faith doctrine is misplaced.  *See United States v. Rosa*, 626 F.3d 56 (2nd Cir. 2010); *United States v. Sandalo*, No. 21-708-cr, 2023 WL 3885805 (2d Cir. 2023).  Importantly, the courts in both cases concluded that the search warrants were not so facially deficient as to preclude reasonable reliance under *Groh* and *Leon*.  *See Rosa*, 626 F.3d at 66 ("Not every facially deficient warrant, however, will be so defective that an officer will lack a reasonable basis for relying upon it . . . and the defective warrant in this case certainly did not have the glaring deficiencies of the itemless warrant in *Groh*."); *Sandalo*, 2023 WL 3885805, at *3 ("We are not convinced that the warrant was so facially deficient in failing to exclude the in-law apartment that the executing officers' reliance upon it was unreasonable.").  Here, the government has not attempted to argue that the warrants were particularized enough that a reasonable officer could rely upon them.

Moreover, the result in *Rosa* rests, at least in part, on the rule developed in *Herring v. United States*, 555 U.S. 135 (2009), that the exclusionary rule should only apply in situations where the benefits of suppression would outweigh its costs, such as where officers deliberately or recklessly disregard Fourth Amendment rights.  *See Rosa*, 626 F.3d at 66.  However, the Sixth Circuit — unlike the Second Circuit — has held that "*Herring* does not purport to alter that aspect of the exclusionary rule which applies to warrants that are facially deficient warrants *ab initio*," such as those that fail for want of particularity.  *United States v. Lazar*, 604 F.3d 230, 237-38 (6th Cir. 2010).

Additionally, the government argues that officers could rely in good faith on the forensic search warrants because a state prosecutor signed off on them.  The government cites *Massachusetts v. Sheppard*, 468 U.S. 981, 985, 989 (1984), and *Leon*, 468 U.S. at 902-04 & n.4, for the proposition that review by a prosecutor supports a finding of good faith.  But, as *Sheppard* explains, a prosecutor's review of a warrant was one of the facts showing that officers "took every step that could reasonably be expected of them" to ensure that the warrant was not deficient. *Sheppard*, 468 U.S. at 989.  This was consistent with the rationale underlying the good faith exception — that the exclusionary rule promotes deterrence, and it does not serve that purpose to exclude evidence obtained by an officer who had no reason to believe he was doing anything wrong.  In general, a police officer who hears from a prosecutor and a magistrate judge that a warrant is not defective has no reason to believe otherwise.  *See id.* at 989-90; *see also Illinois v. Gates*, 462 U.S. 213, 263 (1983) (White, J., concurring) ("[T]he exclusionary rule was adopted to deter unlawful searches by police, not to punish the errors of magistrates and judges.").  But that rationale does not apply in circumstances where an officer has "no reasonable grounds for believing that the warrant was properly issued," including in cases where a warrant's particularity

is so lacking that no reasonable officer could believe the warrant was valid. *Leon*, 468 U.S. at 923. Although an attorney may have signed off on the UMPD forensic search warrants, the executing officer's failure to heed his own obligation to ensure that the warrant satisfied the particularity requirement rendered his reliance on it unreasonable.

Next, the government contends that even if the good faith exception does not save the UMPD's forensic search warrants, the doctrine separately applies to save the subsequent FBI search warrant. The government cites *McClain*, which held that officers could rely in good faith on a warrant obtained based on evidence seized in an earlier warrantless search if the first search was "close enough to the line of validity" that officers reasonably could believe that a second search derived from the first was constitutional. *See* 444 F.3d at 566 ("Because the officers who sought and executed the search warrants acted with good faith, and because the facts surrounding the initial warrantless search were close enough to the line of validity to make the executing officers' belief in the validity of the search warrants objectively reasonable, we conclude that despite the initial Fourth Amendment violation, the *Leon* exception bars application of the exclusionary rule in this case"); *see also United States v. Gordon*, 346 F. Supp. 3d 999, 1017 (E.D. Mich. 2018) (suggesting that good faith exception would apply where "agents would [not] necessarily have realized that the initial search was illegal, or that the evidence they were collecting as a result of that search was fruit of the poisonous tree . . .").

But in *United States v. Tucker*, 742 F. App'x 994 (6th Cir. 2018), the Sixth Circuit, after considering *McClain*, held that "when both searches are conducted pursuant to a search warrant, each warrant must be sought and executed by law enforcement in good faith as prescribed by *Leon*." *Id.* at 1003. The court explained that "if a reasonably well-trained officer would have known that the initial search was illegal, it is hard to see how such an officer could believe in the

- 40 -

validity of the second warrant." *Ibid.* So it is here. Because it is undisputed that the UMPD search warrants were themselves so lacking in particularity that no reasonable officer could rely on them, the FBI could not reasonably expect that the second warrant would purge the taint of the first, and the good faith doctrine does not apply.

Finally, the government urges that the exclusionary rule should not apply here because it would "leave the government in a worse position than before the unconstitutional conduct occurred." ECF No. 32, PageID.184 (citing *Murray*, 487 U.S. at 541; *Jenkins*, 396 F.3d at 758). That is not self-evident. As discussed above, the government has not shown that the evidence would have come to light at all if not for UMPD's initial illegal searches. Exclusion of that evidence therefore puts the FBI in the exact same position in which it would have been if the searches never happened — that is, in a position without the evidence discovered in those searches.

\* \* \* \* \* \*

The UMPD's forensic search warrants are invalid, and the evidence uncovered in the searches under the federal search warrant for the digital devices is fruit of the poisonous tree. The government has not shown that the FBI's search warrant was a source independent of the initial unlawful search, and no other exception to the exclusionary rule applies. Weiss's motion to suppress the evidence obtained in the forensic device searches will be granted.

IV.

Weiss also moves to suppress the materials returned by Apple, Inc., in response to a UMPD search warrant. That warrant calls for production of certain digital evidence in Weiss's iCloud account "between the dates of 08-29-2022 through 01-05-2023," ECF No. 44-1, PageID.381. However, Apple produced data from Weiss's account from as early as 2020. Weiss argues that the evidence obtained under this warrant should be suppressed because the search "was executed

in flagrant disregard of the warrant's terms, completely ignoring the date restrictions it mandated."
ECF No. 29, PageID.138-39.

The iCloud data that the government seeks to use against Weiss is not the product of an illegal search in the same way as the data stored on his devices. The only evidence clearly showing that law enforcement reviewed any of the iCloud data before the FBI sought its federal warrant is an email from Detective James Cargill of UMPD, which states that he reviewed and "tagged" 14 of the files returned from Apple. ECF No. 54-2, PageID.547. The parties have not shown that the 14 files were outside the temporal scope of the search warrant. And, to the extent that UMPD did exceed the scope of the warrant in its initial search, Weiss has not pointed to any evidence showing that UMPD's review of this handful of files was a substantial or motivating factor in the FBI's decision to open an investigation and apply for a federal warrant, and the application for a federal warrant does not include any evidence derived from Apple's production. In other words, there is no evidence that the 14 files that Detective Cargill "tagged" prompted the FBI's decision to seek a warrant or were material to the federal magistrate's decision to issue one. Therefore, even assuming that the UMPD reviewed data outside the scope of the warrant, the FBI's subsequent search warrant — which contained no time limitations — would serve as an independent source of that data. *Williams*, 656 F. App'x at 753; *Murray*, 487 U.S. at 542. The government's use of the iCloud data does not run afoul of the Fourth Amendment.

Weiss offers some additional arguments in favor of suppression that only merit brief discussion. One of his arguments is that Apple's overproduction of records violated the Stored Communications Act. *See* 18 U.S.C. § 2702(a)(1), (b)(3). However, violations of a federal statute do not trigger the exclusionary rule unless the statute itself so provides. *United States v. Abdi*, 463 F.3d 547, 556 (6th Cir. 2006). The Stored Communications Act "has a narrow list of remedies,

- 42 -

and . . . suppression is not one of them." *United States v. Guerrero*, 768 F.3d 351, 358 (5th Cir. 2014); *see also United States v. Jones*, 908 F. Supp. 2d 203, 209 (D.D.C. 2012) ("[A]ll courts that have addressed the issue have held that the SCA does not provide for a suppression remedy."). Therefore, even if Weiss is correct that Apple violated the Stored Communications Act in producing the iCloud files, that violation does not create an independent basis to exclude them from the trial.

Weiss also argues that Apple was a state actor when it produced the records, such that suppression is warranted, notwithstanding the conduct of the UMPD or the FBI. As a general matter, cooperating with the government in a criminal investigation or proceeding does not convert a private actor into a state actor. *See Moldowan v. City of Warren*, 578 F.3d 351, 399 (6th Cir. 2009) ("Providing information to the police, responding to questions about a crime, and offering witness testimony at a criminal trial does not expose a private individual to liability for actions taken 'under color of law.'" (quoting *Briscoe v. LaHue*, 460 U.S. 325, 329 (1983)).

Weiss cites *United States v. Hardin*, 539 F.3d 404 (6th Cir. 2008), for the contrary proposition. In that case, the Sixth Circuit held that an apartment manager acted as an "agent" of the government, and therefore was a state actor, when police directed him to enter an apartment and see if a suspect was inside, under the "ruse" that he was investigating a water leak. *Id.* at 418. But the court explained that "where . . . *the intent of the private party* conducting the search is *entirely independent* of the government's intent to collect evidence for use in a criminal prosecution, . . . the private party is not an agent of the government." *Ibid.* (quoting *United States v. Howard*, 752 F.2d 220, 227 (6th Cir.), *vacated on other grounds*, 770 F.2d 57, 62 (6th Cir.1985)). The *Hardin* court found that the requisite independence was lacking: "the ruse involving the apartment manager's entry to Apartment 48 to check for a non-existent water leak

was 'without a doubt' the officers' idea." *Ibid.*  There is no such evidence here.  Apple did not act at the behest of the government by overproducing the records.  It simply was responding to a search warrant, and it warned that "certain files within the iCloud backup data may contain aggregated data where Apple was unable to apply a date filter."  ECF No. 44-2, PageID.385.  The government only asked for a limited set of records in its warrant, and there is no evidence that the government intended for Apple to produce anything beyond the scope of the warrant.

In a similar vein, Weiss relies on *Commonwealth v. Gumkowski*, 167 N.E.3d 803, 811-12 (Mass. 2021), which held that cell phone records should have been suppressed because a police officer "instigated" the private cell phone company's search of records, rendering the cell phone company's production of the records state action.  But here, Apple's overproduction of records was not "instigated" or directed by a government actor because the warrant expressly requested data from a certain date range, and Apple voluntarily (or, at minimum, inadvertently) produced a larger set of records on its own initiative.

V.

The search warrants authorizing the search of the various digital devices by the UMPD violated the Fourth Amendment's particularity requirement, and no later action by federal authorities erased their unconstitutionality.  The evidence seized thereby must be subject to the exclusionary rule.  However, the search warrant and production of information from the defendant's iCloud account suffers no constitutional defects.

Accordingly, it is **ORDERED** that the defendant's motion to suppress the evidence obtained from the search of the digital devices (ECF No. 25) is **GRANTED**.

- 44 -

- 45 -

It is further **ORDERED** that the defendant's motion to suppress the evidence obtained from the defendant's iCloud account (ECF No. 29) is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Date:   July 1, 2026